UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

MIGUEL BERRIOS, ANN L. BERRIOS,
and KIMBERLY A. CONLON

Plaintiffs,

-vs-

STATE UNIVERSITY OF NEW YORK
AT STONY BROOK, SHIRLEY
STRUM KENNY, Individually and in her
Official Capacity, JEFFREY E. PESSIN,
Individually and in his Official Capacity,
CRAIG C. MALBON, Individually and in
his Official Capacity, NORMAN H.
EDELMAN, Individually and in his
Official Capacity, and FU PEN CHIANG,
Individually and in his Official Capacity,

Defendants.

-------------------------------------------------------X



**CV** 06 5848

**COMPLAINT**

CV-_____

Jury Trial Demanded

WEXLER. J.

BOYLE, M.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   OCT 27 2006   ★

LONG ISLAND OFFICE

Plaintiffs, MIGUEL BERRIOS, ANN L. BERRIOS, and KIMBERLY A.

CONLON, by their attorneys, The Law Office of Steven A. Morelli, complaining of the

Defendants, respectfully allege as follows that:

## PRELIMINARY STATEMENT

1.      The State University of New York at Stony Brook ("Stony Brook

University"), and the various defendants set forth herein, have acted under

color of state law to deny plaintiffs their constitutional rights in a campaign to

harass the plaintiffs from their positions with the University in retaliation for

reporting serious wrongdoings, for seeking to address these issues in State

Court, and for generally exercising their rights to freedom of speech.

1

2. Dr. Miguel Berrios has worked for Stony **Brook** University for over twenty years and has an excellent record of research, publication, and accomplishment. Dr. Berrios has been harassed, undermined, and deprived of his right to freedom of speech for more than half of his twenty years of service by the above referenced individual. When he finally complained about this harassment, Dr. Berrios was further harassed and retaliated against for asserting his right to petition the government.

3. Mrs. Ann L. Berrios has worked for Stony **Brook** University for over twenty years and has an excellent service record. Dr. Kimberly A. Conlon has worked for Stony Brook University for over ten years and has an excellent record of research, publication, and accomplishment.

4. Mrs. Ann L. Berrios began to be harassed after her husband's lawsuit by her own supervisor as another form of retaliation against her husband. Dr. Kimberly A. Conlon simply was doing her job working for Dr. Berrios when she was accused of having a sexual relationship with him in a further attempt to ruin hers and the doctor's careers.

5. The President of the University has done nothing to remedy the situation despite numerous complaints giving her full knowledge of the retaliation and harassment the Plaintiffs have experienced. Other officials at the University have conspired together to push all three Plaintiffs out of work and out of their way. The Defendants must all be punished and hereby estopped from continuing this intentional, vengeful pattern of wrongdoing.

2

## JURISDICTION AND VENUE

6.    This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1986, to
      redress violations of Plaintiff Miguel Berrios's Constitutional Rights to
      freedom of speech and equal access to the courts, Plaintiffs Ann L. Berrios's
      and Kimberly A. Conlon's Constitutional Rights to freedom of association,
      and Plaintiffs' rights, privileges and immunities secured to them by Article IV
      and the First, Fifth, and Fourteenth Amendments of the Constitution of the
      United States, by the Defendants, acting under color of law, as well as any
      other cause of action which can reasonably be inferred from the facts set forth
      herein.

7.    This action also contains claims of intentional infliction of emotional distress,
      injurious falsehood, and negligent supervision and retention under New York
      State law.

8.    The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343(a)(3),
      1367, and the aforementioned statutory and constitutional provisions.

9.    Venue is proper pursuant to 28 U.S.C. §1391.

## PARTIES

10.   Plaintiff Miguel Berrios ("Dr. Berrios"), at all times hereinafter mentioned,
      was and still is a resident and domiciliary of the State of New York, County of
      Suffolk.

3

11. Plaintiff Ann L. Berrios ("Mrs. Berrios"), at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

12. Mrs. Berrios and Dr. Berrios are married.

13. Plaintiff Kimberly A. Conlon ("Dr. Conlon"), at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

14. Dr. Berrios is a Permanent Resident of the United States. Mrs. Berrios and Dr. Conlon are United States Citizens.

15. Defendant Stony Brook University, at all times hereinafter mentioned, was and still is a corporation incorporated under the New York Education Law, doing business in the State of New York, County of Suffolk.

16. Defendant Shirley Strum Kenny ("Kenny"), at all times hereinafter mentioned, was and still is the President of Stony Brook University.

17. Upon information and belief, Defendant Kenny, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

18. Defendant Jeffrey E. Pessin ("Pessin"), at all relevant times since the spring of 2002, was and still is the Chair of the Department of Pharmacological Sciences ("Department of Pharmacology"), School of Medicine, at Stony Brook University.

4

19. Upon information and belief, Defendant Pessin, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

20. Defendant Craig C. Malbon ("Malbon"), as more fully described herein, has at various times throughout his employment at Stony Brook University, held the titles of Associate Dean for Research of the Medical School, University Vice President of Research and member of the President's Cabinet, Vice Dean for Scientific Affairs of the Medical School, and has at all times hereinafter mentioned been a faculty member in the Department of Pharmacology.

21. Defendant Malbon, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

22. Defendant Norman H. Edelman ("Edelman"), as more fully described herein, has at various times throughout his employment at Stony Brook University, held the concurrent titles of Dean of the Medical School and University Vice President for Health Services and member of the President's Cabinet, and has at all times hereinafter mentioned been a faculty member of the Medical School at Stony Brook University.

23. Upon information and belief, Defendant Edelman, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

24. Defendant Fu Pen Chiang ("Chiang"), at all times hereinafter mentioned, was and still is the Chair of Mechanical Engineering, College of Engineering and Applied Sciences, at Stony Brook University.

5

25. Upon information and belief, Defendant Chiang, at all times hereinafter mentioned, was and still is a resident and domiciliary of the State of New York, County of Suffolk.

26. Defendants Kenny, Pessin, Malbon, Edelman, and Chiang are policymakers for Stony Brook University due to the aforementioned administrative positions they hold at Stony Brook University.

27. Plaintiffs are employees of Defendant Stony Brook University.

28. Dr. Berrios, at all times hereinafter mentioned, was and still is a faculty member in the Department of Pharmacology, School of Medicine, Stony Brook University.

29. In his capacity as a faculty member of the Department of Pharmacology, Dr. Berrios's supervisor has been Defendant Pessin since in or about the spring of 2002.

30. Plaintiff Dr. Berrios spent part of his time as more fully described herein as the Director of the University Microscopy Imaging Center ("UMIC"), a research core facility operated by Defendant Stony Brook University.

31. In his capacity as Director of UMIC, Dr. Berrios's supervisor was Defendant Malbon when Malbon served as the Vice Dean for Scientific Affairs.

32. Dr. Conlon, at all times hereinafter mentioned, was and still is a Research Scientist employed by The Research Foundation of Stony Brook University, and is supported through Dr. Berrios's research funds.

6

33. Mrs. Berrios, at all times hereinafter mentioned, was and still is the Assistant to the Chair of Mechanical Engineering, School of Engineering and Applied Sciences, at Stony Brook University.

34. In her capacity as Assistant to the Chair of Mechanical Engineering, Mrs. Berrios's supervisor was and still is Defendant Chiang.

35. In her capacity as President of Stony Brook University, Defendant Kenny has ultimate authority and supervisory control over Plaintiffs Dr. Berrios and Mrs. Berrios, and Defendants Pessin, Malbon, Edelman, and Chiang.

36. In his capacity as Dean of the Medical School of Stony Brook University, Defendant Edelman had supervisory authority and control over Dr. Berrios, and Defendants Pessin and Malbon.

## BACKGROUND FACTS

37. Dr. Berrios received his Doctor of Philosophy degree in 1983.

38. Dr. Berrios was hired by Stony Brook University to be a faculty member in 1984.

39. Between 1984 and approximately 1991, Dr. Berrios's time was allocated completely to his responsibilities as a full-time faculty member in the Department of Pharmacology of Stony Brook University.

40. Dr. Berrios's title in the Department of Pharmacology is Research Associate Professor.

41. As a Research Associate Professor, Dr. Berrios's duties include teaching professional and graduate students, conducting basic research, seeking

7

extramural research support, and participating in public committees and other activities of departmental and University service.

42. Dr. Berrios is the author of forty-five scientific publications, nine inventions, and is a minority cancer researcher for the National Cancer Institute ("NCI"), an Institute of the National Institutes of Health ("NIH").

43. Between 1984 and in or about 1999, Dr. Berrios's supervisor in the Department of Pharmacology was Dr. Arthur P. Grollman.

44. In or about 1991, the UMIC facility at Stony Brook University was in shambles and in need of leadership.

45. In or about November 1991, Dr. Berrios accepted the administrative position of Director of the UMIC facility.

46. Throughout Dr. Berrios's directorship of UMIC, Dr. Berrios's time was allocated approximately 20% to UMIC responsibilities and 80% to his faculty responsibilities in the Department of Pharmacology.

47. In or about 1993, UMIC became fully operational and self-supporting as a result of Dr. Berrios's efforts.

48. UMIC was a fee-for-service research core facility with necessary resources to conduct research projects requiring advanced light and electron microscopy techniques.

49. Under Dr. Berrios's leadership, UMIC grew from a few users per year to nearly six hundred users per year, thus becoming one of the largest core facilities at Stony Brook University and in the Long Island region.

50. From UMIC's inception in 1991 to in or about 1994, Defendant Malbon's administrative title at Stony Brook University was Associate Dean for Research.

51. Since in or about 1994 to in or about 1996, Defendant Malbon's administrative title at Stony Brook University was University Vice President for Research and, as such, he was a member of the President's Cabinet.

52. In or about 1995, members of the UMIC team discovered that Defendant Malbon and a member of Defendant Malbon's laboratory research team in the Department of Pharmacology had falsified scientific data that was processed and/or obtained through the use of the UMIC facility and Defendant Malbon's laboratory.

53. Dr. Berrios informed Defendant Malbon of the UMIC team's findings.

54. In or about 1996, Defendant Malbon was fired from his position of University Vice President for Research.

55. In or about 1996, Defendant Malbon was appointed Vice Dean for Scientific Affairs at the School of Medicine, Stony Brook University.

56. In his capacity as Vice Dean for Scientific Affairs, Defendant Malbon had direct supervisory control over the UMIC facility and Dr. Berrios in his capacity as Director of the UMIC facility.

57. At this time, Defendant Malbon began a continuous, intentional, abusive pattern of harassment against Dr. Berrios, Mrs. Berrios, and Dr. Conlon in an attempt to undermine Dr. Berrios's career and the future of the UMIC facility, which continues to this day.

9

58. Defendant Malbon continued his pattern of academic dishonesty during this period of time.

59. In or about April 1997, Defendant Malbon publicly announced to the national media that he had discovered the cause of breast cancer.

60. Defendant Malbon's claims were completely false and the results of his research in this area, if any, were highly exaggerated.

61. Defendant Malbon also engaged in highly unethical acts of abusive behavior and sexual harassment targeted at his subordinates since as early as 1990.

62. Despite Defendant Malbon's academic dishonesty and unethical conduct, Defendant Kenny failed and refused to take any action whatsoever against Defendant Malbon because Defendant Malbon was Defendant Kenny's "protégé".

63. Throughout 1998 and 1999, Dr. Berrios made requests to the then-Chair of the Department of Pharmacology, Dr. Arthur P. Grollman, for the continuing appointment of Dr. Berrios in the Department of Pharmacology based on Dr. Berrios's years of service and his performance.

64. The terms "continuing appointment" and "tenure" are interchangeable.

65. Dr. Grollman agreed to Dr. Berrios's request and directed a Department administrator and union officials to commence the procedure necessary to obtain a continuing appointment for Dr. Berrios.

66. Dr. Berrios requested similar support from Defendant Malbon, which received no response.

10

67. Instead, Defendant Malbon orchestrated the resignation of Dr. Grollman in December 1999.

68. Dr. Grollman's resignation postponed the continuing appointment of Dr. Berrios.

69. Dr. Berrios continued to pursue his endeavor of obtaining a continuing appointment by speaking to Dr. David L. Williams ("Williams"), the interim Chair of the Department of Pharmacology, but received little support due to what had happened to the previous Chair, Dr. Grollman, at the hands of Defendant Malbon.

70. In or about February 2000, Defendant Malbon accused Dr. Berrios and the UMIC staff of not providing adequate off-site assistance to Hsien-Yu Wang on the use of her own optical instrumentation.

71. This allegation was completely false.

72. Hsien-Yu Wang was Defendant Malbon's graduate student, second wife, scientific collaborator, and laboratory associate.

73. It was at this time that Dr. Berrios discovered that Defendant Malbon's 1996 termination as University Vice President for Research was due to a scientific misconduct investigation of Defendant Malbon that was initiated as a result of the aforementioned falsified findings of Defendant Malbon.

74. During the investigation, apparently Defendant Malbon successfully argued that he was unaware of the ongoing scientific misconduct that occurred in his laboratory.

11

75. Dr. Berrios's report and personal knowledge of Defendant Malbon's false data would have proven that Defendant Malbon was aware of the scientific misconduct.

76. As a result, Defendant Malbon's harassing behavior towards Dr. Berrios, Mrs. Berrios, and Dr. Conlon escalated.

77. In or about April 2000, Defendant Malbon distributed a questionnaire ("the survey") to Stony Brook University faculty to elicit responses regarding the functioning and effectiveness of different Stony Brook University research core facilities.

78. The survey was intentionally biased against UMIC.

79. In or about April 2000, Dr. Williams, at Defendant Malbon's direction, began making negative and unjustified comments about Dr. Berrios in an attempt to thwart Dr. Berrios's attempts to obtain a continuing appointment.

80. At this time, Dr. Williams indicated to Dr. Berrios that Defendant Malbon was unhappy with Dr. Berrios and UMIC based upon the results of the survey.

81. Defendant Malbon refused to tell Dr. Berrios who received or responded to his survey, and refused to disclose to Dr. Berrios the results of the survey.

82. In the summer of 2000, Dr. Williams, at Defendant Malbon's direction, unreasonably increased Dr. Berrios's teaching load to a level equal to or greater than that of tenured Full Professors in the Department of Pharmacology despite that Dr. Berrios's attempts to achieve tenure were being thwarted by Defendant Malbon and Dr. Williams.

12

83.  In July 2001, Dr. Berrios's five-year term employment contract with Stony Brook University was up for renewal.

84.  In July 2001, Defendant Malbon attempted to appoint Glen N. Itzkowitz ("Itzkowitz"), a non-scientist of lower rank than Dr. Berrios, as Dr. Berrios's supervisor in an attempt to undermine Dr. Berrios's authority in the Department of Pharmacology. Defendant Malbon's plan never came to fruition.

85.  At or about this same time, acts of vandalism began to occur at Dr. Berrios's and Mrs. Berrios's home, necessitating their summoning the Suffolk County Police.

86.  In July 2001, Defendant Malbon sent requests to Stony Brook University faculty to write evaluations of Dr. Berrios's performance as Director of the UMIC facility for the preceding five-year term, without the required consent of Dr. Berrios, despite that the faculty were completely unfamiliar with UMIC's internal operations.

87.  In July 2001, Defendant Malbon wrote a false and misleading performance evaluation of Dr. Berrios.

88.  In August 2001, Dr. Williams presented Dr. Berrios with a performance program containing terms not required of either tenured faculty members or research faculty members of the Department of Pharmacology.

89.  On August 20, 2001, Defendant Malbon held a meeting with the Interim Chair Williams, Itzkowitz, Karen B. Pfister ("Pfister"), and Dr. Berrios to discuss

13

Dr. Berrios's performance program evaluation for the preceding five-year term.

90. At this meeting, Pfister indicated that she was uncomfortable that Dr. Berrios had no one representing him at this meeting.

91. On August 17, 2001, Dr. Berrios filed a formal complaint with Defendant Malbon's then-supervisor, Vice President for Health Sciences and Dean of the Medical School, Defendant Edelman, who failed and refused to act on Dr. Berrios's complaint despite assurances to the contrary that he would investigate the complaint.

92. Defendant Edelman later denied ever having discussed this matter at all with Dr. Berrios in a meeting with Dr. Grollman.

93. Dr. Grollman confronted Defendant Edelman, who then retracted his previous statement, admitted to having discussed the matter with Dr. Berrios, but stated that Dr. Berrios's complaint was "too circumspect and vague" to justify an investigation.

94. Dr. Berrios's staff presented formal complaints to Defendant Kenny, who failed and refused to act on said complaints.

95. In August 2001, Dr. Berrios hired an attorney to protect his rights and his career.

96. In September 2001, Dr. Berrios filed a fourteen-page rebuttal (substantiated by fifteen exhibits) to Defendant Malbon's false performance evaluation of him through the union (United University Professions (UUP)), and requested a formal review of Defendant Malbon's evaluation.

14

97. The rebuttal was never reviewed.

98. In early 2002, Dr. Francis Johnson ("Johnson"), Acting Chair of the Department of Pharmacology, resigned, and Defendant Malbon replaced him with his friend, Defendant Pessin.

99. In March of 2002, Defendant Malbon informed Dr. Berrios that he was relocating a microarray instrument from the Centers for Molecular Medicine to the UMIC space sometime in the first week of May 2002.

100. Such an action would adversely impact UMIC activities and research endeavors of many users within and without Stony Brook, yet Defendant Malbon was brazenly indifferent.

101. Dr. Berrios informed UMIC users of the upcoming rehabilitation of UMIC's space due to the transfer of the microarray instrument.

102. After Defendant Malbon learned that Dr. Berrios notified UMIC users, he directed Dr. Berrios to desist immediately from contacting any UMIC users ever again without his permission despite that Dr. Berrios was the Director of the UMIC facility and had an obligation to inform UMIC users of such activities.

103. Defendant Malbon then distributed a second survey of core facilities to Stony Brook University faculty that was again intentionally biased against UMIC.

104. In early April 2002, Defendant Malbon directed that UMIC be dismantled and that part of the space be reallocated to the microarray instrument despite that UMIC was the largest research core facility at Stony Brook University and in the region.

15

105. This was a further attempt by Defendant Malbon to push Dr. Berrios out of his position as Director of UMIC.

106. While reallocating the UMIC space, Defendant Malbon caused two rooms to be completely demolished, and he discarded microscopes, computers, equipment, and reagents necessary for UMIC operations from areas not involved in his unilateral reallocation of the UMIC space.

107. The discarded equipment's cost was approximately $500,000.00 (Five Hundred Thousand Dollars).

108. Discarding this equipment completely crippled the UMIC facility.

109. Dr. Berrios complained about Defendant Malbon's actions to Defendant Kenny, who failed and refused to take any action against Defendant Malbon.

110. In or about late April 2002, the UMIC staff reported the unlawful disposal of State property to the Office of the State Attorney General and Federal funding agencies.

111. Sometime thereafter, members of the Stony Brook University faculty confronted Defendant Edelman, Defendant Malbon's supervisor, and demanded that the discarded equipment be replaced.

112. The discarded equipment was never replaced.

113. Thereafter, Defendant Malbon attempted to blame Dr. Berrios and two members of his staff for the disposal of the equipment.

114. This allegation was completely false.

115. In or about the late summer of 2002, Defendant Edelman informed Dr. Berrios that Defendant Malbon would no longer be serving as Dr. Berrios's

16

supervisor, in his capacity as Director of UMIC, and that Johnson would be Dr. Berrios's new supervisor; however, Defendant Malbon was never officially removed from the UMIC reporting structure.

116. In Defendant Malbon's capacity as Vice Dean for Scientific Affairs, he retained full fiscal control over UMIC and Johnson, thereby having the power to continue influencing Johnson's decisions despite no longer being Dr. Berrios's "official" supervisor (in Dr. Berrios's capacity as Director of UMIC).

117. In September 2002, false and sexually explicit graffiti concerning Dr. Berrios and Dr. Conlon was found in the Department of Pharmacology by Erich R. Bremer ("Bremer").

118. Upon information and belief, Defendant Malbon was responsible for the graffiti.

119. Approximately two weeks later, more false and sexually explicit graffiti concerning Dr. Berrios and Dr. Conlon appeared in the Department of Pharmacology.

120. Upon information and belief, Defendant Malbon was responsible for the graffiti.

121. Dr. Berrios reported the graffiti to the Department of Pharmacology administrator, Lynda Ayala.

122. Approximately two weeks later, in October 2002, a harassing letter was mailed via the United States Post Office to Mrs. Berrios at her home implying

that a sexual relationship was being maintained between Dr. Berrios and Dr.

Conlon, and expressing concern for the Berrioses' children.

123.   This allegation is completely untrue.

124.   Upon information and belief, Defendant Malbon was responsible for the letter.

125.   The Berrioses' called the Suffolk County Police regarding this letter.

126.   In October 2002, Defendant Malbon released the results of his second core

facility survey by mail and the Internet, unprompted and without justification.

127.   The only negative survey results were with respect to UMIC.

128.   The negative results were attributed to the way Defendant Malbon

intentionally designed the survey to be biased against UMIC and the way

Defendant Malbon collected and tallied the results.

129.   In October 2002, UMIC staff demanded, to Susan Blum, Stony Brook

University Counsel, the removal of the survey results from the Internet and

the retraction of the false and misleading survey results.

130.   In November 2002, the survey results were removed but were never retracted.

131.   On November 12, 2002, Defendant Malbon again posted the UMIC survey

results on the Internet without justification as another form of harassment.

132.   In November 2002, Johnson directed the Department of Pharmacology senior

faculty to vote on Dr. Berrios's consideration for a tenured position in the

Department.

133.   The vote did not follow any established protocol.

134.   The vote resulted in no further consideration for a continuing faculty

appointment for Dr. Berrios.

135. On April 15, 2003, Dr. Berrios filed a Notice of Claim against Stony Brook University and Defendant Malbon, individually and in his official capacity, with the New York Court of Claims

136. On or about November 28, 2005, the action in the New York Court of Claims was settled between the parties, however the settlement proceeds have yet to be received by Dr. Berrios.

137. Dr. Berrios continued to be in the employ of Stony Brook University after he filed his claim and after the settlement of November 28, 2005.

## CLAIMS FOR RELIEF

### 1. Dr. Berrios Has Been Retaliated Against for Asserting His Right to Petition the Government

138. Dr. Berrios repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

139. In or about 2003, after Dr. Berrios filed a claim with the New York State Court of Claims, Defendant Malbon was caught on videotape placing sexually implicit material in Dr. Berrios's departmental mailbox at Stony Brook University.

140. This was an intentional act of retaliation designed to implicate Dr. Berrios in unprofessional misconduct.

141. In early 2004, during the litigation of the New York State Court of Claims action, Stony Brook University was required to turn over the surveillance videotape to the New York Assistant Attorney General and Dr. Berrios's attorneys.

19

142.    Dr. Berrios discovered that the videotape had been tampered with and the
        scenes showing Defendant Malbon's retaliatory behavior had been deleted.

143.    Immediately after Defendant Malbon was caught putting the sexually implicit
        material in Dr. Berrios's mailbox, Dr. Berrios filed a complaint with Ms.
        Cristina Vargas-Law ("Vargas-Law"), Director of the Office of Affirmative
        Action of Stony Brook University, and with Defendant Kenny.

144.    The Affirmative Action office is part of Defendant Kenny's office in her
        capacity as President of Stony Brook University.

145.    Defendant Kenny did not take any action against Defendant Malbon despite
        her knowledge of the surveillance videotape.

146.    On behalf of Defendant Kenny, Ms. Vargas-Law sent a letter to Dr. Berrios
        stating that the case had been administratively closed.

147.    This letter directed Dr. Berrios to never discuss the case again.

148.    As part of the discovery phase of the New York State Court of Claims action,
        Dr. Berrios received a copy of his official personnel file from Stony Brook
        University.

149.    Dr. Berrios learned that these documents had also been falsified.

150.    The file was different from that kept at the Human Resources Office and
        contained false signatures and false files for the purpose of discrediting Dr.
        Berrios.

151.    In July 2003, Defendant Pessin, knowing that UMIC was decimated by
        Defendant Malbon, assisted Williams with the removal of an ultramicrotome

20

from UMIC inventory to Williams's laboratory in the Department of Pharmacology.

152. Of the three ultramicrotomes at UMIC, only the one that Defendant Malbon and Williams removed was fully operational.

153. The other two ultramicrotomes were off-line due to severe mistreatment that occurred during Defendant Malbon's reallocation of UMIC space in April 2002.

154. By this act, Defendant Pessin crippled the UMIC facility even more than it had already been.

155. In early 2004, the Berrioses' home was vandalized three times in the same day.

156. Upon information and belief, Defendant Malbon committed the acts of vandalism.

157. Dr. Berrios again called the Suffolk County Police.

158. Defendant Pessin was notified about the involvement of Suffolk County Police detectives (the crime unit) regarding the vandalism.

159. The vandalism stopped soon thereafter.

160. Upon information and belief, Defendant Pessin informed Defendant Malbon about the involvement of the Suffolk County Police crime unit detectives as a warning to Defendant Malbon, who thereafter stopped vandalizing Dr. Berrios's home.

161. In June 2004, Defendant Pessin provided Dr. Berrios with a letter of commitment for Dr. Berrios's Career Development Award grant application.

162. Weeks later, on the day the grant application was to be submitted to NIH, Defendant Pessin attempted to withdraw his letter of support from the application package.

163. This act would have effectively eliminated any chance that NIH would review the grant application.

164. Between December 2004 and January 2005, Dr. Berrios and his assistant, Ms. Martin, were reviewing UMIC's rates with Stony Brook University accounting officials.

165. Dr. Berrios and Ms. Martin learned that Stony Brook University was aware that Defendant Malbon had inappropriately used and handled Federal and University funds.

166. Dr. Berrios questioned University accountants as to this matter, and learned that the accountant would not press the issue out of fear for their jobs since Defendant Malbon, in his capacity as Vice Dean for Scientific Affairs, operated without any true fiscal oversight.

167. In or about January 2005, after Stony Brook University learned of the first of two trial postponements, the head of Human Resources, on behalf of Defendant Kenny and Pessin, sent an official notice of non-renewal of contract to Dr. Berrios.

168. As stipulated in the UUP collective bargaining agreement, Dr. Berrios sent a letter to Defendant Kenny requesting an explanation for the non-renewal action.

169. Defendant Kenny never responded to this letter.

170. In August 2005, Defendant Malbon was fired from his position as Vice Dean for Scientific Affairs.

171. Around the same time as his termination as Vice Dean for Scientific Affairs, Defendant Malbon was caught asking Erich Bremer to erase information from all of Defendant Malbon's University laptop computers' hard drives.

172. The University computers' hard drives that Defendant Malbon was trying to erase contained pornography, as well as information that was pertinent to Dr. Berrios's claims.

173. From April 15, 2002 through January 2006, the UMIC facility was starved of funds and resources, which eventually reduced it to a fraction of its pre-2002 installed and service capacity.

174. However, between late 2002 and early 2006, Defendants Pessin and Malbon diverted resources and built a microscopy imaging facility that was parallel to UMIC over which they would have complete control.

175. On January 18, 2006, Dr. Wadie Bahou, the current Vice Dean for Scientific Affairs, asked Dr. Berrios to step down as Director of UMIC since he had decided to shut down and dismantle UMIC as of February 1, 2006.

176. Dr. Bahou was stunned to learn from Dr. Berrios that UMIC was still functioning and operational, albeit at a reduced capacity.

177. Dr. Bahou requested that Dr. Berrios instruct his staff to vacate the facility since his assistant, Itzkowitz, was eager to change UMIC's main door lock combination and start "clearing" the space.

23

178. Inside the UMIC space there is a cabinet **housing** an extensive permanent image archive (kept on CDs and DVDs).

179. The UMIC image archive included, *inter alia,* the 1995 falsified data from Defendant Malbon's laboratory.

180. Itzkowitz was Defendant Malbon's former **assi**stant.

181. Upon learning that Itzkowtiz was 'eager' to **change** the locks and clear the space, Dr. Berrios informed Dr. Bahou that **he** would personally deliver to him the only key to the cabinet housing the **permanent** image archives.

182. With the close of the UMIC facility, Dr. **Berrios** devoted 100% of his time to his faculty position in the Department of **Pharma**cology.

183. In 2005, before the settlement on the New **York** State Court of Claims action, Dr. Berrios learned that his contract with **Stony** Brook University set to expire in January 2006 would not be renewed.

184. The contract, agreed to in July 2001 with **Williams** and approved by Defendant Edelman, provided for a discretio**nary** salary increase effective July 1, 2001, at a rate of 10% of Dr. Berrios's **salary** base.

185. Dr. Berrios had been largely excluded from **any** discretionary increases during the preceding contract's term.

186. Similarly, Dr. Berrios was largely excluded **from** significant discretionary increases during the 2001-06 contract term.

187. Defendants Pessin and Malbon had direct **invol**vement with the non-renewal of Dr. Berrios's contract and were responsible for his exclusion from consideration for discretionary increases.

24

188.  Despite this, Dr. Berrios was given a temporary position that would extend his employment with Stony Brook University until January 2007.

189.  On January 30, 2006, upon Dr. Berrios's return to the Department of Pharmacology, Defendant Pessin increased Dr. Berrios's teaching schedule to three times that of any other faculty member in the Department.

190.  Dr. Berrios is also the Director of certain courses.

191.  The Director of a course is solely responsible for administering the course, setting the subjects to be taught, establishing the schedule of lectures and examinations, securing lecturers from the Department of Pharmacology and elsewhere, selecting the assigned textbooks and providing handouts, writing and grading the examinations, and providing final grades to the University administrators. The Director of a course may also teach some of the credit hours.

192.  Traditionally, certain courses referenced as HBH330-31, HBH510-11, and HBH545 have had Directors who are senior primary faculty (tenured professors), and at least two of those courses have had a different primary faculty person as its Director.

193.  Due to Defendant Malbon's and Pessin's aforementioned retaliation, Dr. Berrios was only classified as secondary research faculty (untenured).

194.  Despite being classified as secondary faculty in the Department of Pharmacology, Dr. Berrios was not only assigned to teach in courses HBH330-31, HBH510-11, and HBH545, but he was assigned as the Director of all three courses!

195. In addition to being the Director of courses HBH330-31, HBH510-11, and HBH545, Dr. Berrios was also required to increase his total teaching from about 27 credit hours per year to approximately 75 credit hours per year.

196. In April 2006, Dr. Roger Cameron, Director of the Undergraduate Pharmacology courses BCP401 and BCP402, informed Dr. Berrios that Defendant Pessin had indicated to him that Dr. Berrios was available to teach a total of 40 credit hours in those courses.

197. On May 1, 2006, when Dr. Berrios discussed these additional requirements placed upon him with Defendant Pessin, Defendant Pessin threatened Dr. Berrios with termination if he refused to comply.

198. In order to comply with Defendant Pessin's demands to teach in BCP401 and BCP402, Dr. Berrios increased his teaching load from about 75 credit hours per year to over 90 credit hours per year.

199. Dr. Berrios also had to maintain approximately 58 office hours per year for the students enrolled in the courses of which he was the Director.

200. Dr. Berrios's course directorships and substantial teaching load effectively preclude him from continuing his research endeavors, editing works, participating in committees, and seeking extramural support.

201. Dr. Berrios was also required to teach lectures and be a small group leader in course HBH531.

202. Other primary faculty members are not required to take part in course HBH531 despite their availability to do so.

203. Dr. Berrios is the only secondary faculty member required to be a small group leader in HBH531.

204. Defendant Pessin does not require any primary faculty to take on the same type of teaching schedule or responsibilities as required of Dr. Berrios. For example, when Dr. Berrios is compared to other faculty in the Department of Pharmacology:

    a)    Defendant Malbon, who returned to his full-time position as faculty in the Department of Pharmacology after he was fired from his administrative position, receives "safe haven" under Defendant Pessin's supervision as Department Chair since Defendant Pessin owes his job to Defendant Malbon..

    b)    Defendant Malbon only teaches about 4 credit hours compared to Dr. Berrios's 90 credit hours per year, three course directorships, 58 office hours, and responsibilities as small group leader in another course.

    c)    Defendant Malbon draws a salary of over $300,000.00 (Three Hundred Thousand Dollars) per year as compared to Dr. Berrios's salary of $108,000.00 (One Hundred and Eight Thousand Dollars) per year despite the huge disparity in their teaching schedules.

    d)    Another faculty member, Dr. Paul A. Fisher, is a director of a course as well, but Dr. Fisher is "protected," and is not required to teach in any of Dr. Berrios's courses for the reason that "he is too busy directing a course," as stated by Defendant Pessin, even though Dr. Fisher has no active research programs. In contrast, Dr. Berrios is

27

never "too busy directing a course" (he directs three courses) to be required to teach in the courses he directs and other courses.

e)   Dr. Berrios is also required to teach undergraduate courses in addition to his professional and graduate courses while other primary faculty are not required to do so even when they have available time to do so.

f)   As a secondary faculty member, Dr. Berrios has a number of restrictions placed on him in his capacity as a faculty member; such as: his participation in faculty meeting is subject to limits, and he cannot invite seminar speakers or expect a subsidy from the Department of Pharmacology, despite that other primary faculty members are afforded these benefits.

g)   Another tenured faculty member recently promoted to Full Professor, Dr. Moshe Eisenberg, has a 15%-20% effort in the Department of Pharmacology for which he has been assigned to teach only about 10 credit hours per year. Dr. Eisenberg has no active research programs.

205.   Dr. Berrios specifically incorporates by reference all of the allegations contained in Plaintiffs' Fourth and Sixth Claims herein.

206.   All of the aforementioned acts have been taken against Dr. Berrios directly in retaliation for his filing a claim in the New York Court of Claims to redress the harassment that occurred prior to April 2003.

207.   As a Permanent Resident of the United States, Dr. Berrios was and still is entitled to petition the government by way of having access to the court system to redress wrongs done against him.

28

208. Defendants Kenny and Edelman were informed about the ongoing retaliation Dr. Berrios has experienced.

209. Defendants Kenny and Edelman knew or should have known about the infringement of Dr. Berrios's constitutional rights and failed to take appropriate remedial action necessary to ensure Dr. Berrios's rights would not continue to be violated.

210. The aforementioned retaliation was taken against Dr. Berrios with Defendant Kenny's and Defendant Edelman's knowledge and/or consent.

211. The aforementioned failure of Defendants Kenny and Edelman to act amounted to a deliberate or reckless disregard of Dr. Berrios's constitutional rights.

212. Defendant Chiang knew or should have known that the aforementioned harassment of Mrs. Berrios would have an adverse emotional and psychological impact on Dr. Berrios.

213. Defendant Chiang, intentionally or with reckless disregard, harassed Mrs. Berrios in an attempt to retaliate against Dr. Berrios for filing an action in the New York State Court of Claims.

214. Defendants Pessin and Malbon intentionally retaliated against Dr. Berrios for asserting his rights in court.

215. Defendants Pessin, Malbon, and Chiang conspired together against Dr. Berrios in order to retaliate against him for filing a claim in the New York State Court of Claims.

216. By reason of Defendants Pessin's, Malbon's, Edelman's, Chiang's and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University with regard to retaliating against its employees for complaining about harassment and asserting their constitutional rights.

217. As a result of the foregoing, Defendants have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Dr. Berrios's First Amendment right to petition the government under the color of law.

218. As a result of the foregoing, Dr. Berrios was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Dr. Berrios has also suffered a loss of his reputation, as well as the loss of respect of his peers, which can lead to significant damages in a closely-knit, academic community. Dr. Berrios has also been compelled to expend great amounts of his time and money to retain legal counsel to pursue his former claim, this claim, and all related matters.

### 2. Dr. Berrios and Dr. Conlon Have Been Retaliated Against for Asserting Their Right to Freedom of Speech

219. Dr. Berrios and Dr. Conlon repeat, reiterate and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein. Dr. Conlon specifically incorporates by reference the allegations contained in Plaintiffs' sixth claim herein.

30

220. In reference to paragraph 110 herein, Dr. Conlon reported the unlawful disposal of UMIC equipment to Defendant Kenny, the Chancellor of the State University of New York, the Governor of New York, and several local and State legislators.

221. On February 24, 2005, Dr. Conlon and Mrs. Berrios privately met with Defendant Kenny to discuss Dr. Berrios's contract non-renewal and the harassment that the Plaintiffs had been suffering at the hands of Defendant Malbon.

222. Defendant Kenny failed and refused to respond to Dr. Conlon's and Mrs. Berrios's concerns.

223. All of the aforementioned acts have been taken against Dr. Berrios and Dr. Conlon directly in retaliation for their choice to speak freely on matters of public concern, specifically, but not limited to, Defendant Malbon's falsification of data and results, and for complaining to University officials about the acts of harassment they experienced at Stony Brook University.

224. As a Permanent Resident of the United States, Dr. Berrios was and still is entitled to speak freely on matters of public concern.

225. As a United States Citizen, Dr. Conlon was and still is entitled to speak freely on matters of public concern.

226. Defendants Kenny and Edelman were informed about the ongoing retaliation Dr. Berrios and Dr. Conlon experienced.

227. Defendants Kenny and Edelman knew or should have known about the infringement of Dr. Berrios's and Dr. Conlon's constitutional rights and failed

31

to take appropriate remedial action necessary to ensure their rights would not continue to be violated.

228. The aforementioned retaliation was taken against Dr. Berrios and Dr. Conlon with Defendant Kenny's and Defendant Edelman's knowledge and/or consent.

229. The aforementioned failure of Defendants Kenny and Edelman to act amounted to a deliberate or reckless disregard of Dr. Berrios's and Dr. Conlon's constitutional rights.

230. Defendants Pessin and Malbon intentionally retaliated against Dr. Berrios and Dr. Conlon for exercising their right to speak freely on matters of public concern.

231. By reason of Defendants Pessin's Malbon's, Edelman's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University with regard to retaliating against its employees for complaining about harassment and asserting their constitutional rights.

232. As a result of the foregoing, Defendants Stony Brook University, Pessin, Edelman, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Dr. Berrios's and Dr. Conlon's First Amendment right to freedom of speech under the color of law.

233. As a result of the foregoing, Dr. Berrios and Dr. Conlon were caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional,

32

psychological and physical injuries, severe stress, apprehension, and anxiety. Dr. Berrios and Dr. Conlon have also suffered a loss of their reputations, as well as the loss of respect of their peers, which can lead to significant damages in a closely-knit, academic community. Dr. Berrios and Dr. Conlon have also been compelled to expend great amounts of their time and money to retain legal counsel to pursue their claims and all related matters.

### 3. Dr. Berrios Has Been Denied Due Process of Law

234. Dr. Berrios repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

235. Dr. Berrios has a property interest in his job.

236. Dr. Berrios's interest in his job has been continually interfered with and eventually taken from him by the Defendants.

237. But for the acts of the Defendants, Dr. Berrios's interest in his job would not have been stripped from him.

238. Dr. Berrios has a liberty interest in his right to earn and pursue a living.

239. The Defendants have intentionally or with reckless disregard interfered with Dr. Berrios's right to earn and pursue a living.

240. Dr. Berrios was entitled to further review of the decision to deny the renewal of his contract for another term of employment with Stony Brook University.

241. Dr. Berrios was entitled to receive a statement of reasons for the denial of the renewal of his contract of employment with Stony Brook University.

242. Dr. Berrios's contract with Stony Brook University was denied for renewal in 2005 without due process of law.

33

243. Defendants Kenny and Edelman knew or should have known about the infringement of Dr. Berrios's constitutional rights and failed to take appropriate remedial action necessary to ensure Dr. Berrios's rights would not continue to be violated.

244. The aforementioned interference with Dr. Berrios's substantive rights was done with Defendant Kenny's and Defendant Edelman's knowledge and/or consent.

245. The aforementioned failure of Defendants Kenny and Edelman to act amounted to a deliberate or reckless disregard of Dr. Berrios's constitutional rights.

246. Defendants Pessin and Malbon intentionally interfered with Dr. Berrios's substantive rights in retaliation for the New York State Court of Claims action that Dr. Berrios filed.

247. By reason of Defendants Pessin's Malbon's, Edelman's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University.

248. As a result of the foregoing, Defendants Stony Brook University, Pessin, Edelman, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Dr. Berrios's constitutional rights to due process of law under the color of law.

249. As a result of the foregoing, Dr. Berrios was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment,

34

humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Dr. Berrios has also suffered a loss of his reputation, as well as the loss of respect of his peers, which can lead to significant damages in a closely-knit, academic community. Dr. Berrios has also been compelled to expend great amounts of his time and money to retain legal counsel to pursue his former claim, this claim, and all related matters.

### 4. Mrs. Berrios's Right to Freedom of Association Has Been Violated

250.   Mrs. Berrios repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

251.   Defendant Chiang personally knew, and was in frequent contact with, Defendant Malbon.

252.   Defendant Chiang was aware of Defendant Malbon's scholarly misconduct and unethical behavior towards his female subordinates.

253.   In or about 2003, Defendant Chiang learned about Dr. Berrios's claims in the New York State Court of Claims against Defendant Malbon and Stony Brook University.

254.   Subsequently, Defendant Chiang began to harass Mrs. Berrios at her workplace.

255.   Defendant Chiang would frequently ask Mrs. Berrios how her husband's case was going and about similar subjects related to her husband and Stony Brook University.

256. Defendant Chiang would frequently criticize Mrs. Berrios's work unjustifiably.

257. Defendant Chiang would put special work limitations on Mrs. Berrios that did not apply to other similarly situated employees.

258. In contrast to other Chairs in the College of Engineering and Applied Sciences, Defendant Chiang prevented Mrs. Berrios from supervising the Chairman's Office secretarial staff.

259. In March 2004, Defendant Chiang authorized Mrs. Berrios's vacation time during Easter week's academic break.

260. When Mrs. Berrios returned from her vacation, she discovered that Defendant Chiang had sent her an email memorandum pretending that he had not given her authorization to take a vacation.

261. In April 2004, Defendant Chiang sent a memorandum falsely accusing Mrs. Berrios of being responsible for mistakes made by others in the creation of a slide presentation.

262. The same memorandum also accused Mrs. Berrios of misappropriating Departmental funds.

263. This accusation was completely false and utterly impossible since Defendant Chiang had never given Mrs. Berrios signature authority on fiscal matters.

264. Defendant Chiang made these accusations to implicate Mrs. Berrios in professional misconduct and attribute to her poor workmanship in an attempt to further harass and retaliate against her for her husband's actions.

265. In June 2004, Mrs. Berrios filed a complaint with UUP about Defendant Chiang's harassing behavior.

266. UUP responded by simply stating that it was aware of Dr. Chiang's abrasive nature.

267. Throughout 2005, leading up to the expected resolution of Dr. Berrios's litigation with Stony Brook University and Defendant Malbon, Defendant Chiang's harassment and retaliatory behavior towards Mrs. Berrios continued and escalated.

268. Defendant Chiang's associate, Dr. John Kincaid ("Kincaid"), also began to harass Mrs. Berrios at Defendant Chiang's direction.

269. In November 2005, a credentialing panel made a site visit to the College of Engineering and Applied Sciences.

270. In contrast to standard procedures, Defendant Chiang neither consulted with nor communicated with Mrs. Berrios before or during the site visit.

271. During this visit, Dr. Yacov Shamash, Dean of Engineering and Applied Sciences at Stony Brook University, invited Mrs. Berrios to attend a luncheon honoring the site visitors.

272. Defendant Chiang unjustifiably withheld permission and prevented Mrs. Berrios from accepting the invitation.

273. In February 2006, three months after the site visit, Defendant Chiang blamed Mrs. Berrios for escorting the site visitor to the wrong classroom—an action he claimed jeopardized the College's standing.

37

274. In December 2005, Defendant Chiang learned that Dr. Berrios's litigation had ended with Stony Brook University and Defendant Malbon.

275. Defendant Chiang told Mrs. Berrios that she should leave the matter behind her and "move on".

276. Defendant Chiang's harassing and retaliatory behavior continued and made it impossible for Mrs. Berrios to "move on".

277. In March 2006, Defendant Chiang attempted to push through an incomplete promotion and tenure package.

278. After the incomplete promotion package was rejected, Defendant Chiang blamed Mrs. Berrios for the outcome.

279. In March 2006, Mrs. Berrios's physician detected hypertension in Mrs. Berrios despite that she was on medication. Her physician informed her that she should demand a change at work and take a two-week medical leave of absence lest she "die at her desk."

280. Out of fear for retaliation from Defendant Chiang, Mrs. Berrios did not take the suggested medical leave of absence.

281. In March 2006, Defendant Chiang authorized Mrs. Berrios to take a vacation during the Easter week academic break so that she could visit her family.

282. The day after he authorized the vacation, Defendant Chiang sent email memoranda to Mrs. Berrios that contained inappropriate comments about her family and which falsely stated that Defendant Chiang had not authorized the time off.

283. Mrs. Berrios filed a complaint with UUP about Defendant Chiang's emails regarding her previously authorized vacation plans and Defendant Chiang's resulting harassing behavior.

284. UUP responded by informing Mrs. Berrios that Defendant Chiang had no right to interfere with her vacation plans under the circumstances.

285. Just days before Mrs. Berrios's vacation in 2006, she complained to Dean Shamash about Defendant Chiang's harassing behavior.

286. Dean Shamash is Defendant Chiang's sole and direct supervisor.

287. On March 30, 2006, Dean Shamash met with Mrs. Berrios regarding her complaint.

288. Mrs. Berrios returned to work on April 11, 2006, after returning from her vacation.

289. From April 11, 2006 to in or about June 2006, Defendant Chiang continued to harass Mrs. Berrios by ignoring her and pretending that she was not even in Defendant Chiang's office with him.

290. Kincaid continued to cooperate with Defendant Chiang's pattern and plan of harassment.

291. On June 6, 2006, Dean Shamash sent a letter to Mrs. Berrios stating that he had looked into her complaint in an effort to resolve the matter.

292. On July 6, 2006, Defendant Chiang called an impromptu meeting between two other members of his faculty and Mrs. Berrios to present Mrs. Berrios with a yearly performance evaluation.

293. The two other faculty members at the meeting, one of which was Kincaid, were unjustifiably present since they were not authorized to issue a performance evaluation of Mrs. Berrios.

294. Defendant Chiang's act of calling this meeting without warning and in front of two faculty members who should not have been present was an attempt to harass and intimidate Mrs. Berrios.

295. The performance evaluation inaccurately labeled Mrs. Berrios's work as unsatisfactory and lacking in certain areas.

296. The evaluation Mrs. Berrios received was unjustified in that it attributed certain professional shortcomings to her that fell outside of her assigned duties, and referenced mistakes that she had allegedly made that, in fact, were made by Defendant Chiang himself.

297. The performance evaluation also notified Mrs. Berrios that her contract with Stony Brook University would not be renewed.

298. On July 10, 2006, Mrs. Berrios sent a letter to Dean Shamash indicating that she disagreed with her performance evaluation and which further advised him of Defendant Chiang's harassing behavior.

299. Dean Shamash did not respond to this letter.

300. On July 15, 2006, Mrs. Berrios presented a formal rebuttal of Defendant Chiang's performance evaluation of her to UUP and to Stony Brook University. This rebuttal consisted of twelve pages and twenty-two exhibits substantiating the grounds for her position.

301. A performance evaluation review committee was convened and met with Mrs. Berrios on August 29, 2006.

302. On August 8, 2006, Mrs. Berrios filed a formal complaint of harassment and retaliation with Vargas-Law, the head of the Stony Brook University Office of Affirmative Action.

303. On August 9, 2006, Vargas-Law met with Mrs. Berrios about her complaint against Defendant Chiang and Kincaid.

304. Mrs. Berrios submitted a six-page document substantiated by fifteen exhibits to Vargas-Law detailing her complaint of harassment and retaliation.

305. Defendant Chiang's harassment did not stop.

306. The Office of Affirmative Action of Stony Brook University has taken no measures to remedy the complained-of harassment that Mrs. Berrios is experiencing.

307. Mrs. Berrios continued to be in the employ of Stony Brook University after she received her notice of non-renewal on July 6, 2006 (A formal letter of non-renewal was mailed to Mrs. Berrios's home on or about August 1, 2006).

308. But for Mrs. Berrios's association with Dr. Berrios, the aforementioned acts would not have occurred.

309. As a United States Citizen, Mrs. Berrios is entitled to associate freely with whomever she wishes.

310. Defendant Kenny was informed about the ongoing infringement of Mrs. Berrios's rights.

311. Defendant Kenny knew or should have known about the infringement of Mrs. Berrios's constitutional rights and failed to take appropriate remedial action necessary to ensure Mrs. Berrios's rights would not continue to be violated.

312. The aforementioned retaliation was taken against Mrs. Berrios with Defendant Kenny's knowledge and/or consent.

313. The aforementioned failure of Defendant Kenny to act amounted to a deliberate or reckless disregard of Mrs. Berrios's constitutional rights.

314. Defendant Chiang intentionally harassed Mrs. Berrios because she was associated with Dr. Berrios.

315. Defendant Chiang conspired with Defendant Malbon and Kincaid to harass Mrs. Berrios because she was associated with Dr. Berrios.

316. By reason of Defendants Chiang's, Malbon's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University.

317. As a result of the foregoing, Defendants Stony Brook University, Chiang, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Mrs. Berrios's First Amendment right to associate freely under the color of law.

318. As a result of the foregoing, Mrs. Berrios was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Mrs. Berrios has

42

also suffered a loss of her reputation, as well as the loss of respect of her peers, which can lead to significant damages in a closely-knit, academic community. Mrs. Berrios has also been compelled to expend great amounts of her time and money to retain legal counsel to pursue this claim and all related matters.

### 5. Mrs. Berrios Has Been Denied Due Process of Law

319. Mrs. Berrios repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

320. Mrs. Berrios has a property interest in her job.

321. Mrs. Berrios's interest in her job has been continually interfered with and eventually taken from her by the Defendants.

322. But for the acts of the Defendants, Mrs. Berrios's interest in her job would not have been stripped from her.

323. Mrs. Berrios was entitled to further review of the decision to deny the renewal of her contract for another term of employment with Stony Brook University.

324. Mrs. Berrios was entitled to receive a statement of reasons for the denial of the renewal of her contract of employment with Stony Brook University.

325. Mrs. Berrios's contract with Stony Brook University was denied for renewal without due process of law.

326. Mrs. Berrios has a liberty interest in her right to earn and pursue a living.

327. The Defendants have intentionally or with reckless disregard interfered with Mrs. Berrios's right to earn and pursue a living,

43

328. Defendant Kenny knew or should have known about the infringement of Mrs. Berrios's constitutional rights and failed to take appropriate remedial action necessary to ensure Mrs. Berrios's rights would not continue to be violated.

329. The aforementioned interference with Mrs. Berrios's substantive rights was done with Defendant Kenny's knowledge and/or consent.

330. The aforementioned failure of Defendant Kenny to act amounted to a deliberate or reckless disregard of Mrs. Berrios's constitutional rights.

331. Defendant Chiang and Malbon intentionally interfered with Mrs. Berrios's substantive rights because she was associated with Dr. Berrios.

332. By reason of Defendants Chiang's, Malbon's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University.

333. As a result of the foregoing, Defendants Stony Brook University, Chiang, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Mrs. Berrios's constitutional rights to due process of law under the color of law.

334. As a result of the foregoing, Mrs. Berrios was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Mrs. Berrios has also suffered a loss of her reputation, as well as the loss of respect of her peers, which can lead to significant damages in a closely-knit, academic

44

community. Mrs. Berrios has also been compelled to expend great amounts of her time and money to retain legal counsel to pursue this claim and all related matters.

### 6. Dr. Conlon's Right to Freedom of Association Has Been Violated

335. Dr. Conlon repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

336. Dr. Conlon's salary is, in general, derived from research grants secured by Dr. Berrios.

337. In early 2005, Dr. Berrios requested 'bridging' salary support for Dr. Conlon from Defendant Pessin.

338. Despite Dr. Berrios's salary offset contributions to the Department, Defendant Pessin refused to provide 'bridging' salary support for Dr. Conlon.

339. Defendant Pessin stated that he only gives 'bridging' support to those whom he considers worthwhile to support.

340. This statement was intended to mean that Dr. Conlon was not "worthwhile to support."

341. This statement and the implication it contains were unjustified in light of Dr. Conlon's contributions to Stony Brook University and its Department of Pharmacology.

342. Defendant Pessin stated that Dr. Conlon would have to leave the Department of Pharmacology if Dr. Berrios could not find other sources of support for her.

343. Dr. Conlon specifically incorporates by reference the allegations contained in paragraphs 192-200 inclusive.

45

344. The forced termination of Dr. Berrios's research endeavors and extramural research support adversely affects Dr. Conlon's longstanding and successful collaboration with Dr. Berrios, as well as her job standing at Stony Brook University.

345. In March 2006, Dr. Conlon volunteered to teach 1 credit hour in course HBH545, for which Dr. Berrios is course Director.

346. Defendant Pessin informed Dr. Berrios that Dr. Conlon is not allowed to teach because of her rank as a secondary research faculty member in the Department of Pharmacology.

347. Dr. Conlon and Dr. Berrios confronted Defendant Pessin and demonstrated to him that his assertion was untrue and discriminatory.

348. Dr. Conlon provided further evidence of discrimination to Defendant Pessin.

349. Subsequently, Defendant Pessin demanded an apology from Dr. Conlon in exchange for being allowed to teach 1 credit hour in HBH545 and to receive $50.00 (Fifty Dollars) for her efforts.

350. Dr. Conlon refused to apologize to Defendant Pessin.

351. Dr. Berrios was forced to assume the responsibility for Dr. Conlon's 1 credit hour in HBH545.

352. But for Dr. Conlon's association with Dr. Berrios, the aforementioned acts would not have occurred.

353. As a United States Citizen, Dr. Conlon is entitled to associate freely with whomever she wishes.

354. Defendants Kenny and Edelman were informed about the ongoing infringement of Dr. Conlon's rights.

355. Defendants Kenny and Edelman knew or should have known about the infringement of Dr. Conlon's constitutional rights and failed to take appropriate remedial action necessary to ensure Dr. Conlon's rights would not continue to be violated.

356. The aforementioned retaliation was taken against Dr. Conlon with Defendant Kenny's and Defendant Edelman's knowledge and/or consent.

357. The aforementioned failure of Defendants Kenny and Edelman to act amounted to a deliberate or reckless disregard of Dr. Conlon's constitutional rights.

358. Defendants Pessin and Malbon intentionally harassed Dr. Conlon because she was associated with Dr. Berrios.

359. Defendants Pessin and Malbon conspired together to harass Dr. Conlon because she was associated with Dr. Berrios.

360. By reason of Defendants Pessin's Malbon's, Edelman's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University.

361. As a result of the foregoing, Defendants Stony Brook University, Pessin, Edelman, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Dr. Conlon's First Amendment right to associate freely under the color of law.

362.   As a result of the foregoing, Dr. Conlon was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Dr. Conlon has also suffered a loss of her reputation, as well as the loss of respect of her peers, which can lead to significant damages in a closely-knit, academic community. Dr. Conlon has also been compelled to expend great amounts of her time and money to retain legal counsel to pursue this claim and all related matters.

### 7. Dr. Conlon Has Been Denied Due Process of Law

363.   Dr. Conlon repeats, reiterates and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

364.   Dr. Conlon has a property interest in her job.

365.   Dr. Conlon's interest in her job has been continually interfered with and eventually taken from her by the Defendants.

366.   But for the acts of the Defendants, Dr. Conlon's interest in her job would not have been stripped from her.

367.   Dr. Conlon has a liberty interest in her right to earn and pursue a living.

368.   The Defendants have intentionally or with reckless disregard interfered with Dr. Conlon's right to earn and pursue a living.

369.   Defendants Kenny and Edelman knew or should have known about the infringement of Dr. Conlon's constitutional rights and failed to take

48

appropriate remedial action necessary to ensure Dr. Conlon's rights would not continue to be violated.

370. The aforementioned interference with Dr. Conlon's substantive rights was done with Defendant Kenny's and Defendant Edelman's knowledge and/or consent.

371. The aforementioned failure of Defendants Kenny and Edelman to act amounted to a deliberate or reckless disregard of Dr. Conlon's constitutional rights.

372. Defendants Pessin and Malbon intentionally interfered with Dr. Conlon's substantive rights because she was associated with Dr. Berrios.

373. By reason of Defendants Pessin's, Malbon's, Edelman's, and Kenny's official positions at Stony Brook University, their acts and/or omissions constitute the official policy and/or custom of Stony Brook University.

374. As a result of the foregoing, Defendants Stony Brook University, Pessin, Edelman, Malbon, and Kenny have, intentionally or with reckless disregard, deprived, conspired to deprive, contributed to the deprivation of, or failed to remedy any deprivations of, Dr. Conlon's constitutional rights to due process of law under the color of law.

375. As a result of the foregoing, Dr. Conlon was caused to sustain damages and injuries, which include, but are not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Dr. Conlon has also suffered a loss of her reputation, as well as the loss of respect of her

49

peers, which can lead to significant damages in a closely-knit, academic community. Dr. Conlon has also been compelled to expend great amounts of her time and money to retain legal counsel to pursue this claim and all related matters.

### 8. Intentional Infliction of Emotional Distress

376. Plaintiffs repeat, reiterate and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

377. Defendant Chiang's, Malbon's, and Pessin's conduct toward Plaintiffs was outrageous and shocking, exceeding all reasonable bounds of decency as measured by what the average member of the community would tolerate under similar circumstances.

378. Defendant Chiang's, Malbon's, and Pessin's conduct toward Plaintiffs caused Plaintiffs severe emotional distress.

379. Defendants Chiang, Malbon, and Pessin harassed and retaliated against Plaintiffs with the desire to cause emotional distress to Plaintiffs, under circumstances known to them that made it substantially certain that such distress would follow, or recklessly with utter disregard of the consequences that might follow.

380. As a result of the foregoing, Plaintiffs have suffered substantial damages, including, but not limited to: embarrassment, humiliation, mental and physical distress, emotional, and psychological injuries, severe stress, apprehension, and anxiety.

### 9. Injurious Falsehood

381.   Plaintiffs repeat, reiterate and re-allege each and every allegation set forth
       above with the same force and effect as if more fully set forth herein.

382.   Defendants Pessin, Malbon, and Chiang have, as more fully described above,
       made false statements regarding the Plaintiffs and their abilities to do their
       work effectively, which have led to the termination of their employment at
       Stony Brook University.

383.   The statements described herein that give rise to this claim were made
       intentionally and maliciously in an attempt to discredit Plaintiffs at their
       places of business.

384.   But for the false, malicious statements, Plaintiffs' employment with Stony
       Brook University would not have been terminated.

385.   As a result of the foregoing, Plaintiffs have suffered substantial damages,
       including, but not limited to: loss of salary, embarrassment, humiliation,
       mental and physical distress, emotional, psychological and physical injuries,
       severe stress, apprehension, and anxiety. Plaintiffs have also suffered a loss of
       their reputation, as well as the loss of respect of their peers, which can lead to
       significant damages in a closely-knit, academic community.

### 10. Negligent Supervision and Retention

386.   Plaintiffs repeat, reiterate and re-allege each and every allegation set forth
       above with the same force and effect as if more fully set forth herein.

387.   The aforementioned acts or omissions of Defendants Kenny, Edelman,
       Malbon, Pessin, and Chiang were done or not done while each, individually,

was acting within his or her scope of employment with Stony Brook University.

388. The aforementioned acts or omissions of Defendants Kenny, Edelman, Malbon, Pessin, and Chiang were done or not done while each, individually, was acting in furtherance of the business of Stony Brook University.

389. The aforementioned acts or omissions of Defendants Kenny, Edelman, Malbon, Pessin, and Chiang were done or not done intentionally, recklessly, negligently, or with intentional, reckless, or negligent disregard of Plaintiffs' rights.

390. As a result of the foregoing, Stony Brook University has negligently supervised or retained Defendants Kenny, Edelman, Malbon, Pessin, and Chiang, which has caused substantial injury and damages to Plaintiffs including, but not limited to: loss of salary, embarrassment, humiliation, mental and physical distress, emotional, psychological and physical injuries, severe stress, apprehension, and anxiety. Plaintiffs have also suffered the loss of their reputations, as well as the loss of respect of their peers, which can lead to significant damages in a closely-knit, academic community.

**WHEREFORE,** Plaintiffs demand judgment against the Defendants as follows:

a) On the first claim:

i. Awarding money damages in the sum of $1,000,000.00 (One Million Dollars);

ii. Awarding punitive damages in an amount to be determined by a jury;

iii. Granting an injunction requiring **Stony** Brook to renew Dr. Berrios's contract and engage in **the** appropriate proceedings necessary for the continuing **appointment** of Dr. Berrios in good faith, and enjoining Defendants **from** considering this or any prior lawsuit in their deliberations; **and,**

iv. Awarding reasonable attorneys **fees;**

b) On the second claim:

i. Awarding money damages in **the sum** of $1,000,000.00 (One Million Dollars);

ii. Awarding punitive damages in **an amount** to be determined by a jury;

iii. Granting an injunction requiring **Stony** Brook to renew Dr. Berrios's contract and engage in **the** appropriate proceedings necessary for the continuing **appointment** of Dr. Berrios in good faith, and enjoining Defendants **from** considering this or any prior lawsuit in their deliberations; **and,**

iv. Awarding reasonable attorneys **fees;**

c) On the third claim:

i. Awarding money damages in **the sum** of $1,000,000.00 (One Million Dollars);

ii. Awarding punitive damages in **an amount** to be determined by a jury;

        iii.  Granting an injunction requiring Stony Brook to renew Dr.

            Berrios's contract and engage in the appropriate proceedings

            necessary for the continuing appointment of Dr. Berrios in good

            faith, and enjoining Defendants from considering this or any prior

            lawsuit in their deliberations; and,

        iv.  Awarding reasonable attorneys fees;

d)    On the fourth claim:

        i.  Awarding money damages in the sum of $250,000.00 (Two

          Hundred and Fifty Thousand Dollars);

        ii.  Awarding punitive damages in an amount to be determined by a

          jury; and

        iii.  Awarding reasonable attorneys fees;

e)    On the fifth claim:

        i.  Awarding money damages in the sum of $250,000.00 (Two

          Hundred and Fifty Thousand Dollars);

        ii.  Awarding punitive damages in an amount to be determined by a

          jury; and

        iii.  Awarding reasonable attorneys fees;

f)    On the sixth claim:

        i.  Awarding money damages in the sum of $250,000.00 (Two

          Hundred and Fifty Thousand Dollars);

        ii.  Awarding punitive damages in an amount to be determined by a

          jury; and

iii. Awarding reasonable attorneys fees;

g) On the seventh claim:

    i. Awarding money damages in the sum of $250,000.00 (Two Hundred and Fifty Thousand Dollars);

    ii. Awarding punitive damages in an amount to be determined by a jury; and

    iii. Awarding reasonable attorneys fees;

h) On the eighth claim:

    i. Awarding money damages in the sum of $1,000,000.00 (One Million Dollars); and,

    ii. Awarding punitive damages in an amount to be determined by a jury;

i) On the ninth claim:

    i. Awarding money damages in the sum of $1,000,000.00 (One Million Dollars); and,

    ii. Awarding punitive damages in an amount to be determined by a jury;

j) On the tenth claim, awarding money damages in the sum of $1,000,000.00 (One Million Dollars); and,

k)      Granting such other and further relief as to the Court seems just and

proper.

Dated: Carle Place, New York
        October 26, 2006

Respectfully submitted,

_X. A. Morelli._

Steven A. Morelli, Esq. (SM 4721)
THE LAW OFFICE OF
STEVEN A. MORELLI
Attorneys for Plaintiffs
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 393-9151

## VERIFICATION

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF Suffolk )

      Miguel Berrios, being duly sworn, states that he has reviewed the foregoing Verified Complaint and that the contents of said Verified Complaint are true to his own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, he believes them to be true.

 

                                               **MIGUEL BERRIOS**

Duly sworn to before me
this 25th day of October 2006

                    NOTARY PUBLIC

DANIKA J. HALL
Notary Public, State of New York
No. 01-CH6032481
Qualified in Suffolk County
Commission Expires November 1, 2009

## VERIFICATION

STATE OF NEW YORK )
                             ) ss.:
COUNTY OF Suffolk )

        Ann L. Berrios, being duly sworn, states that she has reviewed the foregoing Verified
Complaint and that the contents of said Verified Complaint are true to her own knowledge, except as
to matters therein stated to be alleged upon information and belief and, as to those matters, she believes
them to be true.

_Ann L. Berrios_ (signature)

**ANN L. BERRIOS**

Duly sworn to before me
this 25ᵗʰ day of October 2006

_(signature)_

NOTARY PUBLIC

DANIKA J. HALL
Notary Public, State of New York
No. 01-CH6032481
Qualified in Suffolk County
Commission Expires November 1, 2009